UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EMANUEL INMAN,

                     Petitioner,

-vs-

MICHAEL CAPRA,

                     Respondent.
_____

DECISION AND ORDER

6:17-CV-6218 CJS

## INTRODUCTION

Petitioner Emanuel Inman ("Inman" or "Petitioner") brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions after a jury trial, in New York State Supreme Court, Monroe County, of two counts of robbery in the first degree (Penal Law ("PL") § 160.15[2], [4] ), two counts of criminal possession of a weapon in the second degree (PL § 265.03[1][b]; [3]), and of one count of reckless endangerment (PL § 120.25).  The Petition asserts two federal constitutional claims: 1) denial of Petitioner's right to effective assistance of counsel; and 2) denial of Petitioner's right to due process and equal protection.  For the reasons explained below, the petition for a writ of habeas corpus is denied.

## BACKGROUND

As mentioned above, following a jury trial in New York State Supreme Court, Monroe County, Petitioner was convicted of two counts of robbery in the first degree, two counts of criminal possession of a weapon in the second degree, and of one count of reckless endangerment.  Petitioner did not testify at trial.  The trial court sentenced Petitioner, as a second violent felony offender, to determinate terms of 17 ½ years

incarceration and 5 years post-release supervision on each of the robbery counts, determinate terms of 15 years incarceration and 5 years post-release supervision on each of the weapons counts, and an indeterminate term of 3 ½ to 7 years incarceration on the reckless endangerment count, all to run concurrently.

The crimes took place in the parking lot of a Top's supermarket in the City of Rochester, at the intersection of Winton Road and Blossom Road.  The evidence at trial, viewed in the light most-favorable to the prosecution, indicated that on the afternoon of July 30, 2010, a clear and sunny day, Petitioner, a thin black male approximately 6' 2" tall, approached a man who was smoking a cigarette and texting on his phone while standing beside his car, which was parked approximately 150 yards from the entrance of the supermarket.  Petitioner put a gun to the man's throat and said, "Give me what you've got," and then began going through the man's pockets.[1]  As this was happening, a married couple, who had just driven into the parking lot, observed the robbery occurring and began honking their car horn to attract attention and/or to scare off Petitioner.  Petitioner, who had taken the man's wallet containing approximately $200, began to flee, and, realizing that the couple in the car was following him, turned and fired his pistol several times at the car, striking it twice and injuring the wife.   Petitioner dropped his baseball cap as he was fleeing.  Analysis of the hat found a mixture of DNA from several persons, to which Petitioner could not be excluded as a contributor.  A witness from the Monroe County Crime Laboratory, who compared the DNA evidence taken from the hat with a DNA sample taken from Petitioner, testified that one of the DNA profiles found on the hat matched Petitioner's DNA at all points tested, and that the likelihood of the DNA on the

---

[1] The robbery victim indicated to police that the robber was thin and approximately six feet tall, and was wearing a black baseball cap, black shirt and black shorts.

hat belonging to a black male unrelated to Petitioner was less than one in 206 million.[2]  A witness across the parking lot heard the gunshots and then saw two black males, one of whom was tall and thin, run from the direction of the shots and go behind a building. The witness got in his car and followed the tall thin black male, who had emerged from behind the building, until he walked into a nearby apartment complex. [3]  A police K-9 officer later used her tracking dog to follow a scent which the dog picked up at the point where the two black males had crossed the street.  The dog followed the scent along the same path which the tall thin black male had walked but lost the scent in the parking lot of the apartment complex.  A witness who had been standing in the apartment complex's parking lot indicated to police that he had seen a black male get into a blue car, possibly a Chevy Lumina, being driven by a white male, near the spot where the K-9 dog had lost the scent.  However, that witness could not recall the license plate of the blue car.  When police arrested Petitioner several months later[4] at his apartment, they photographed a blue Chevy Lumina parked in the driveway that was registered to another individual who resided at that same address.  Except for the robbery victim, who had been face to face with the robber, none of the other witnesses could identify Petitioner as the black male whom each saw.[5]

---

[2] Trial Transcript at pp. 510-514.

[3] According to this witness, the tall thin black male was wearing a white shirt and blue shorts, and was approximately six feet tall and weighed approximately 180 pounds.

[4] Petitioner's arrest came about in the following manner:  Police showed the robbery victim at least two photo arrays of suspects shortly after the robbery.  The victim did not select anyone from those arrays, though he said that two of the photos resembled the robber somewhat.  After conducting DNA analysis on the hat, police got a "hit" on Petitioner's DNA, which was already in a DNA database.  Police then showed the robbery victim another photo array containing a photo of Petitioner, and the victim selected Petitioner's photo.  The trial court later suppressed that photo array as being unduly suggestive, since the background of Petitioner's photo was different from the other photos, but ruled that the victim had an independent basis to make an in-court identification.

[5] In the brief submitted in support of his direct appeal, Petitioner correctly observed that, "[t]hree witnesses saw the incident [robbery].  Two witnesses saw the flight of possible suspects.  But only [the robbery victim] identified Mr. Inman as the perpetrator."  It is also, true, though, that the other four

As just mentioned, at trial there were two main pieces of evidence connecting Petitioner to the crime, namely, the identification by the robbery victim and the DNA evidence from the hat.  Defense counsel attempted to discredit the robbery victim's identification by suggesting that his testimony concerning the reason why he had been in the parking lot (to buy groceries) was false.  In particular, defense counsel argued that, because the robbery victim, who lived in the suburbs, had come into Rochester and had parked a significant distance away from the entrance of the supermarket while carrying a relatively large amount of cash, it was more likely that he was actually in the parking lot to purchase drugs.[6]  Further in that regard, defense counsel brought out that the robbery victim, who was approximately thirty years of age, had indicated that he did not feel scared during the robbery, and that he had admitted to smoking marijuana as a teenager and to having engaged in certain criminal mischief while still in high school.  Defense counsel suggested that the alleged drug deal had "gone bad," and had turned into a robbery, and that the robbery victim had intentionally misidentified Petitioner as the robber in order to avoid implicating the actual robber, *i.e.*, his dealer/supplier.

Defense counsel also attempted to discredit the testimony of the witnesses by pointing out that several of them had described the robber as having a dark complexion, while Petitioner had what counsel described as a lighter complexion.  Counsel further challenged the accuracy of the robbery victim's identification by noting that the interaction

---

witnesses never identified anyone else as the perpetrator; they simply all indicated that they could not identify the robber except to describe him generally as a tall and thin black male.

[6] The robbery victim indicated that he was in Rochester to pick up his girlfriend, who worked at a pharmacy located in the same shopping plaza as the supermarket.  The victim further indicated that he was carrying cash because it had been a Friday and a payday, and that he parked a distance from the entrance to the store because he intended to smoke a cigarette before going into the store.

was brief and likely stressful, and by asserting that the description the victim gave to the police did not match Petitioner's appearance.[7]

Defense counsel also attempted to discredit the DNA evidence in several ways, such as by challenging the chain of custody of the hat,[8] by pointing out discrepancies in the case-identification numbers on the evidence bag, and by arguing that the DNA evidence failed to positively connect Petitioner to the hat.  Defense counsel also challenged the evidence concerning the blue Chevy Lumina, by eliciting that the witness in the apartment complex parking lot initially told police only that the car might have been a Lumina.  In fact, Defense counsel strenuously argued to the jury that the testimony concerning the two black males seen crossing the street, and the testimony concerning the blue Chevy Lumina, amounted to a "red herring chase by the prosecution . . . that may have absolutely nothing to do with the case."[9]

Counsel further argued that the police investigation had been shoddy and unreliable, arguing for example that, in addition to the alleged mishandling of the DNA evidence the police had failed to obtain video evidence that might have captured the robbery.  In that regard, counsel demonstrated that the police had obtained video surveillance from the supermarket, but from the wrong section of the parking lot.  Counsel further argued that the police had not bothered to have the tracking dog sniff the hat, which suggested that the hat was irrelevant to the investigation.

---

[7] *See, e.g.*, Trial Transcript at p. 596 ("[The victim' comes into court 16 months later and says, despite never having seen this person who robs him [before], and based on three minutes or less of very stressful interaction, and giving a description of his assailant at wide variance with Emanuel Inman, at variance with respect to height, [complexion and facial hair].")

[8] Counsel argued to the jury, for example, that, "[W]hatever this DNA evidence says, it's not entitled to any weight whatsoever if you have no reason to believe this evidence was handles properly by Officer Traverzo, who you never heard from."  Trial Transcript at p. 608.

[9] Trial Transcript at p. 606.

Finally, Defense counsel put on an alibi witness, Petitioner's former girlfriend, who testified that around the date of the robbery Petitioner had generally spent his afternoons with her, though she could not recall whether he had been with her on the afternoon of the robbery.

Following his conviction, Petitioner pursued two collateral attacks pursuant to New York Criminal Procedure Law ("CPL") § 440.10 and a direct appeal.  The two § 440.10 motions raised issues that were mostly unrelated to those asserted in the subject habeas petition, though the second such motion argued, in part, that trial counsel had been ineffective in three specific ways:  1) he failed to properly cross-examine the witness who had honked his car horn at the robber; 2) he failed to argue that Petitioner had been unlawfully arrested; and 3) he failed to introduce evidence concerning a photo array (resulting in a positive identification of Petitioner by the robbery victim) that had been suppressed as unduly suggestive.   The trial court denied both applications and in each of those instances the New York State Supreme Court, Appellate Division Fourth Department ("the Appellate Division") denied leave to appeal.

Petitioner's direct appeal to the Appellate Division asserted four arguments: 1) trial counsel was ineffective for pursuing the "drug-deal-gone-bad" theory of defense, rather than simply attempting to show that the robbery victim's identification was mistaken;  2) trial counsel was ineffective in challenging the DNA evidence;  3) the trial court should not have admitted the DNA evidence since the People never established chain of custody of the hat, and, in particular, that the hat, and any DNA evidence thereon, was in an "unchanged condition" from when it was found;[10] and, 4) the trial court should not have

_____

[10] Petitioner argued to the Appellate Division that while the hat may not have been fungible evidence, the DNA evidence on the hat was fungible since it could have been transferred onto the hat somehow. Petitioner essentially indicated that the evidence technician who processed the hat for DNA evidence

admitted the photo of the blue Chevy Lumina, since the photo was irrelevant insofar as it was never established that Petitioner was the person seen getting into the blue car on the day of the robbery, or that the blue Chevy Lumina in the photo was the same car observed that day.   The first two arguments were based on state law and federal constitutional law, while the third and fourth arguments were based solely on state evidentiary law.   The Appellate Division rejected Petitioner's arguments and affirmed his convictions based upon New York law.   The New York Court of Appeals subsequently denied leave to appeal.

On April 11, 2017, Petitioner filed the subject habeas petition, which, as noted earlier, purports to assert two federal claims: 1) denial of his right to effective assistance of trial counsel; and, 2) denial of his right to due process and equal protection.   Essentially, the petition combines the four arguments raised in Petitioner's direct appeal into these two arguments, and re-casts them as alleging violations of Petitioner's federal constitutional rights, rather than as violations of state law.

More specifically, the Petition alleges that trial counsel was ineffective in two respects: 1) he pursued an "unreasonable" theory of defense, by emphasizing the "drug-deal-gone-bad theory "rather than attempting to establish that the robbery victim's identification was merely mistaken;[11] and 2) he made poor arguments concerning the DNA evidence.   The Petition contends that the state court unreasonably applied federal

---

twelve days after the crime had no way of knowing whether the hat was then in the same condition which it had been in when it was collected.  Petitioner asserted that the only person who could establish the first necessary link in the chain of custody was the evidence technician who collected the hat at the crime scene, who did not testify at trial because he was ill.

[11] Petitioner contends that the drug-deal-gone-bad theory was unreasonable because it was untrue and because it was not supported by the facts.  Petitioner asserts that it would have made more sense for defense counsel to attempt to prove that the robbery victim's identification was mistaken, since no arrest was made for three months, no physical lineup was conduct, the robbery was brief, the victim would have been under stress during the robbery, the victim might have been distracted by the witnesses who honked their car horn, and the victim and perpetrator were of different races.

constitutional law when analyzing the ineffective-assistance claims, by "over-emphasiz[ing] those areas" where trial counsel did a good job, rather than focusing on the prejudice to Petitioner caused by counsel's mistakes.

The Petition further alleges that the trial court violated Petitioner's "rights to Due Process and Equal Protection" by admitting the DNA evidence without testimony from the evidence technician who collected the hat, who was ill at the time of trial.[12]  Similarly, the Petition contends that the trial court's admission of the photo of the blue Chevy Lumina violated Petitioner's rights to Due Process and Equal Protection, since any connection between Petitioner and the car was speculative, and the photo was either irrelevant or its probative value was outweighed by the danger of jury confusion or undue prejudice.  *See, id.* at p. 39 ("[The trial court erred in failing to determine whether the probative value of the evidence was 'substantially outweighed by the danger of unfair prejudice,' thereby violating Petitioner's constitutional rights to due process and equal protection.").[13]

Finally, the Petition contains one additional argument that was not raised in the direct appeal or state-court collateral attacks, namely, that trial counsel was ineffective in failing to properly investigate his alibi defense.  The Petition, though, does not refer to the alibi testimony from Petitioner's former girlfriend offered at trial.  Rather, the Petition

---

[12] The Petition states in pertinent part: "Testimony concerning the initial collection of fungible evidence by government agents is an indispensable step for establishing the admissibility of any scientific testing of that evidence.  In other words, when the 'condition' of the evidence may be easily changed without such change being readily apparent to an observer, proper preserving and handling of that fungible evidence is essential before the People can establish the relevance and reliability of the test results.  *** In the case at bar, no competent proof established the proper start of an admissible chain, and therefore, the lower court clearly erred in allowing DNA test results to be received into evidence, thereby violating Petitioner's constitutional rights to Due Process and Equal Protection." Petition, attached brief at p. 36.

[13] At the same time, however, Petitioner argues that the evidence concerning the blue Chevy Lumina was potentially beneficial to his defense, since it could have been used to explain how the hat, bearing his DNA, was found at the crime scene.  That is, Petitioner argues that defense counsel should have tried to show that the person to whom the car was registered, who resided at Petitioner's address, may have committed the crime while wearing a hat that Petitioner had previously worn.

asserts that counsel failed to investigate other unidentified alibi "witnesses." *See*, Petition at p. 40 ("[D]efense counsel did not properly investigate his alibi defense or the witnesses in support thereof.").  However, the Petition does not allege any particular failure with regard to the investigation of an alibi.

Respondent opposes the petition.  With regard to the ineffective-assistance claims, Respondent contends that the claims involving the "drug-deal-gone-bad defense" and counsel's handling of the DNA evidence lack merit, while the claim involving counsel's alleged failure to investigate an alibi defense is both unexhausted (though not procedurally barred) and meritless.  As for the due process and equal protection claims, Respondent maintains that Petitioner's arguments are unexhausted, procedurally barred, non-cognizable and meritless.

Petitioner filed a reply in which he insists that the claim involving counsel's alleged failure to investigate an alibi defense is exhausted, since his second § 440.10 motion in state court asserted that defense counsel had "failed in *every way* to investigate all the particulars surrounding [the] case."

The Court has considered the parties' submissions and the entire record.

DISCUSSION

Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Evidentiary Hearing Not Required

Pursuant to Rule 8 of Rules Governing Habeas Corpus cases under Section 2254 in the United States District Courts and upon review of the answer, transcript and record, the Court determines that an evidentiary hearing is not required.

<u>Section 2254 Principles</u>

Petitioner brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, and the general legal principles applicable to such a claim are well settled.

> As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and interpreted by the Supreme Court, 28 U.S.C. § 2254—the statutory provision authorizing federal courts to provide habeas corpus relief to prisoners in state custody—is "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011). A number of requirements and doctrines . . . ensure the centrality of the state courts in this arena. First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance. *See id.* (citing 28 U.S.C. § 2254(b)). Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions. *See generally Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If the state court denies a federal claim on the merits, then the provisions of § 2254(d) come into play and prohibit federal habeas relief unless the state court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1)-(2). Finally, when conducting its review under § 2254(d), the federal court is generally confined to the record before the state court that adjudicated the claim. *See Cullen v. Pinholster*, ⸺ U.S. ⸺, 131 S.Ct. 1388, 1398–99, 179 L.Ed.2d 557 (2011).

*Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). As just mentioned, regarding claims that were decided on the merits by state courts,

> a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the

state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A state court decision is contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's result.

A state court decision involves an unreasonable application of clearly established Federal law when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case.  To meet that standard, the state court's decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  It is well established in this circuit that the objectively unreasonable standard of § 2254(d)(1) means that a petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at *7–8 (S.D.N.Y. Jan. 11, 2018) (Koeltl, J.) (citations and internal quotation marks omitted).

<u>Unexhausted and Procedurally Defaulted Claims</u>

Respondent contends that one of Petitioner's claims (the ineffective assistance/alibi claim) is unexhausted but not procedurally defaulted, while two other claims (the due process/equal protection claims) are unexhausted and procedurally defaulted, and that in any event all of those claims lack merit.  The applicable legal principles are clear:

If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the

State; or that there is either an absence of available State corrective process; or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b)(1). To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts," *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir.2001), "to the highest court in the pertinent state," *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir.1990).

When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. In such a case the habeas court theoretically has the power to deem the claim exhausted. *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997). This apparent salve, however, proves to be cold comfort to most petitioners because it has been held that when "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," federal habeas courts also must deem the claims procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

\*\*\*

Dismissal for a procedural default is regarded as a disposition of the habeas claim on the merits.  . . .  For a procedurally defaulted claim to escape this fate, the petitioner must show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice (*i.e.*, the petitioner is actually innocent). *Coleman*, 501 U.S. at 748-50, 111 S.Ct. 2546 (1991).

*Aparicio v. Artuz*, 269 F.3d 78, 89–90 (2d Cir. 2001).

Where a claim is unexhausted but not procedurally barred, meaning that it could still be raised in state court, a district court may stay the action to allow the petitioner to exhaust the claim if, *inter alia*, it is not plainly meritless. *See, Woodard v. Chappius*, 631 F. App'x 65, 66 (2d Cir. 2016) ("Under *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), a district court abuses its discretion in denying a stay to exhaust

claims in a mixed petition if the unexhausted claims are not plainly meritless, if the petitioner has good cause for failing to exhaust, and if the petitioner did not engage in abusive or dilatory litigation tactics. *Id.* at 277–78, 125 S.Ct. 1528.").  However, where a stay is not appropriate, the district court may deny the unexhausted claim if it is meritless. *See, e.g., Wilson v. Graham*, No. 9:17-CV-0863 (BKS), 2018 WL 6001018, at *6 (N.D.N.Y. Nov. 15, 2018) ("A habeas court may, however, deny on the merits a habeas petition containing unexhausted claims if those claims are plainly meritless.").

*Trial Counsel's Alleged Failure to Investigate an Alibi*

Respondent contends that the claim involving counsel's alleged failure to investigate an alibi defense is unexhausted, though not procedurally barred, and meritless.  The Court agrees.  To begin with, the claim is unexhausted since it was not raised in Petitioner's direct appeal or his state-court collateral attacks.  Petitioner disputes this and maintains that the argument was included in his second § 440.10 motion, insofar as he asserted that trial counsel failed to properly investigate any aspect of the case. However, the Court disagrees.  As mentioned earlier, that § 440.10 motion asserted that trial counsel was ineffective in three specific ways:  1) he failed to properly cross-examine the witness who had honked his car horn at the robber; 2) he failed to argue that Petitioner had been unlawfully arrested; and 3) he failed to introduce evidence concerning a photo array (resulting in a positive identification of Petitioner by the robbery victim) that had been suppressed as unduly suggestive.  To the extent that there was an argument in the § 440.10 motion that trial counsel failed to perform a proper investigation, it was in the context of those three claims.  Petitioner did not allege that trial counsel was also ineffective for failing to investigate an alibi defense, either in his 440.10 motion directed

to the trial court or in his application to the Appellate Division for leave to appeal, and neither of those courts discussed such a claim.  Accordingly, the claim is unexhausted.

The Court further agrees that the claim is not procedurally barred, since Petitioner could still file another § 440.10 motion in state court asserting the claim.  However, the Court declines to stay the action to allow Petitioner to return to state court and exhaust the claim.  In that regard, Petitioner has not requested such relief, and the record does not support granting such relief in any event since the claim is plainly meritless.  As to this last point, the Petition states only that, "Defendant asserts that defense counsel did not properly investigate his alibi defense or the witnesses in support thereof."[14]  The Petition does not provide any further information, such as who the alleged alibi "witnesses" are, or how they could have provided Petitioner with an alibi,[15] or how counsel supposedly failed to investigate.  The "claim" is simply a bald assertion unsupported by facts.  Consequently, the Court denies the claim as plainly meritless.

*The Equal Protection and Due Process Claims*

Respondent further maintains that the due process and equal protection claims are unexhausted and procedurally barred, non-cognizable and meritless.  The Court agrees that the claims are procedurally defaulted, and therefore dismisses them.  In this regard, the claims are not exhausted since Petitioner never raised them in the state courts.  That is, Petitioner never argued, in his § 440.10 motions or his direct appeal, that the trial court's admission of evidence violated his federal constitutional rights to due process or equal protection.  Rather, as mentioned earlier, to the extent that Petitioner

---

[14] Petitioner's Memo of Law attached to Petition, at p. 40.
[15] The Court observes that the Defense did put on an alibi witness, Petitioner's girlfriend, though she could not definitively provide a true alibi.  At most, she indicated that Petitioner was often with her during afternoons around the date of the robbery. However, the Petition does not allege that trial counsel was ineffective with regard to his investigation of this alibi witness.

argued in the state courts that the trial court had improperly admitted the DNA evidence and the photo of the blue Chevy Lumina, he did so only on the basis of state evidence law. Consequently, the claims are unexhausted. *See, Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 201 (2d Cir. 2010) ("Exhaustion requires that the prisoner 'fairly present' the federal claim 'in each appropriate state court (including a state supreme court with powers of discretionary review).' *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal quotation marks and citation omitted). A prisoner has not fairly presented a federal claim before a state court if the federal claim is not mentioned in the prisoner's state court brief. *See id.* at 32, 124 S.Ct. 1347.").

The claims, which concern evidentiary rulings by the trial court on the record, are also now procedurally barred under New York law since they could have been raised in Petitioner's direct appeal. It would therefore be futile for Petitioner to attempt to raise them in a new § 440.10 motion.[16] Accordingly, the claims are procedurally defaulted. Moreover, Petitioner has not attempted to make the necessary showing (that there was cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice because he is actually innocent) that would allow the Court to consider the defaulted claims. Nor does the record support such relief. Consequently, the Court dismisses the due process and equal protection claims as procedurally defaulted.

---

[16] *See, Jackson v. Conway*, 763 F.3d 115, 143–44 (2d Cir. 2014) ("Jackson has no further state avenues in which to press this issue because he has completed his direct appeal and the nature of the claim is apparent from the face of the record, meaning that he would be barred from raising it in a motion to vacate the judgment. *See* N.Y.Crim. Proc. Law § 440.10(2)(c) (stating that the court "must deny" a § 440.10 motion when sufficient facts appear on the record to permit appellate review of the claim and the defendant unjustifiably failed to raise that issue on direct appeal); *see also Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir.2003) (applying section 440.10(2)(c) to claims raised for the first time in federal habeas petition). For these reasons, we deem this issue exhausted but procedurally defaulted, *see Sweet*, 353 F.3d at 140, and do not consider it when assessing the prosecutorial misconduct claim.") (footnote omitted).

The Court will now consider the remaining ineffective-assistance claims, which, respondent concedes, were properly exhausted.

Ineffective Assistance of Counsel

In addition to the now-dismissed failure-to-investigate-alibi claim, the Petition also contends that trial counsel provided ineffective assistance, in violation of Petitioner's Sixth Amendment rights, in two ways: 1) by pursuing the "drug-deal-gone-bad" theory of defense, rather than simply attempting to show that the robbery victim's identification was mistaken;   and, 2) by failing to make better efforts to challenge the DNA evidence. (Respondent acknowledges that these claims are exhausted, but contends that they lack merit.)  The Appellate Division rejected these same arguments, stating in pertinent part:

> [D]efendant contends that he was denied effective assistance of counsel. We reject that contention.  Viewing defendant's representation in its entirety, we conclude that defendant was afforded meaningful representation.  It is well settled that disagreements over trial strategy is not a basis for a determination of ineffective assistance of counsel.  In this case, the alleged instances of ineffective are largely based on his hindsight disagreements with defense counsel's trial strategies, and defendant failed to meet his burden of establishing the absence of any legitimate explanations for those strategies.  To the extent that defendant contends that defense counsel was ineffective for failing to object to the prosecutor's remarks during summation, that contention is without merit inasmuch as the prosecutor's comments were fair comment on the evidence and did not constitute prosecutorial misconduct.

State Record at p. 282 (citations omitted).  Petitioner contends that in this regard, the state court unreasonably applied federal constitutional law by "over-emphasiz[ing] those areas" where trial counsel did a good job, rather than focusing on the prejudice to Petitioner caused by counsel's mistakes.

The familiar test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating an ineffective assistance of counsel claim has two prongs. The first

requires showing that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 694. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). Fulfilling the second prong of an ineffective assistance claim requires a showing of prejudice which translates to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner*, 417 F.3d at 319 (citing *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004)).  "Without proof of both deficient performance and prejudice to the defense, the Supreme Court has said, it cannot be shown that the conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the conviction should therefore stand."  *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017) (citations omitted).

In this context, "'[s]trategic choices made by counsel after thorough investigation ... are virtually unchallengeable," and there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland* at 104 S.Ct. 2052).

> In considering the quality-of-representation prong, *i.e.*, whether counsel's performance fell below an objective standard of reasonableness, a court must bear in mind both that counsel has a duty to bring to bear such skill

and knowledge as will render the trial a reliable adversarial testing process, and that counsel must have wide latitude in making tactical decisions. Thus, the court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time, and must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.

*Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (citing *Strickland*, internal quotation marks omitted).

Petitioner argues that to prevail on the performance prong of the *Strickland* test, he must show that the defense theory pursued by counsel was "objectively reasonable," and he must identify a "plausible alternative strategy."[17] Petitioner maintains that he has done both of these things, since he has shown that trial counsel pursued an objectively unreasonable theory, namely, the "drug-deal-gone-bade" theory, while ignoring the plausible alternative theory of "mistaken identification." Indeed, Petitioner asserts that "defense counsel presented his 'drug-deal-gone-bad' theory as the jury's *exclusive* basis for an acquittal."[18] However, this argument is factually incorrect. Rather, Defense counsel pursued a four-pronged approach designed to show that Petitioner was mistakenly identified, of which the "robbery-gone-bad argument" was just one facet. Specifically, the four-pronged approached consisted of the following: 1) discrediting the witnesses to the robbery, by suggesting that robbery victim had a motive to identify someone

---

[17] Petition, attached memo of law at p. 13.
[18] Petition, attached memo of law at p. 17 (emphasis added); *see also, id.* (Naturally, jurors look to the trial attorneys for answers. From start to finish, however, counsel gave the jurors *one* implausible answer: this incident was a 'drug-deal-gone bad.'") (emphasis added).

other than the real robber (i.e., to protect his drug dealer), but also by challenging other aspects of the witnesses' identifications such as their descriptions of the robber's height, complexion, facial hair and clothing; 2) challenging the investigation performed by the police, such as by showing that they had failed to obtain surveillance video from the section of the parking lot in which the robbery occurred or to allow the tracking dog to obtain a scent from the baseball cap; 3) challenging the DNA evidence by attacking the chain of custody and by emphasizing that the evidence did not conclusively establish Petitioner as the contributor to the DNA mixture found on the hat; and 4) presenting an alibi witness.

The Court also disagrees with Petitioner's assertion that the drug-deal-gone-bad theory was completely unsupported by the facts.[19]  As defense counsel pointed out, there were some odd features of the robbery victim's story that arguably supported such a theory, such as the various reasons the victim gave for having parked so far away from the entrance to the store in a relatively remote section of the parking lot, the fact that he was carrying a relatively large amount of cash and the fact that he claimed not to have been afraid during the robbery despite having a pistol pressed to his neck.  Counsel needed to come up with some way to raise reasonable doubt concerning the identification by the robbery victim who had stood face-to-face with the robber in broad daylight, and while this theory may not have been strong, the Court cannot say that it was objectively unreasonable given what counsel had to work with.

---

[19] *See*, Petition, attached memo of law at p. 18 (arguing that there was not "a shred of credible evidence" supporting the drug-deal-gone-bad theory of defense.)

Petitioner nevertheless argues that it would have been *better* if counsel had pursued other methods of establishing misidentification, such as by introducing evidence of the photo-array identification that had been suppressed by trial court. *See*, Petition, attached memo of law at p. 25 ("An aggressive attorney might have raised a mistaken-identification defense by delving into the suggestive features of the October photo array.").  According to Petitioner, "[t]his strategy would give the jurors an explanation for how and why petitioner became connected to this incident."[20]   However, informing the jury that the robbery victim had previously identified Petitioner in a photo array would have presented its own obvious set of risks, and the Court cannot say that it was unreasonable for counsel not to pursue that strategy, particularly where there was also DNA evidence linking Petitioner to the robbery.

In sum, the Court has considered all of Petitioner's arguments (including the arguments concerning counsel's alleged failure to make better arguments concerning the DNA evidence) and finds that he has not demonstrated that trial counsel's performance fell below an objective standard of reasonableness.

The Court further finds that Petitioner has not demonstrated that he suffered the required prejudice from counsel's alleged errors.[21]   Instead, the Court finds, based primarily on the strength of the case against Petitioner consisting of both

---

[20] Petition, attached memo of law at p. 25.

[21] From the language quoted above from the Appellate Division's ruling, the Court understands the Appellate Division to have stopped, after finding that defense counsel did not provide deficient performance, without proceeding to also determine whether Petitioner suffered prejudice.  That was entirely appropriate under federal law. *See, Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018) ("The Strickland Court . . . declared . . . that there is no reason for a court ... to address both components of the inquiry if the defendant makes an insufficient showing on one.") (citations and internal quotation marks omitted), cert. denied, 139 S. Ct. 1608, 203 L. Ed. 2d 761 (2019).

eyewitness identification and DNA evidence, that Petitioner has not shown a reasonable probability that but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *See, Gersten v. Senkowski*, 426 F.3d at 611 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.  In evaluating prejudice, we look to the cumulative effect of all of counsel's unprofessional errors.  We must keep in mind that a verdict or conclusion only weakly supported by the record is more likely to have been affected by counsel's errors. Conversely, where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus.") (citations omitted).

Nor has Petitioner otherwise shown that the state court's ruling denying the ineffective-assistance claims contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See, Henry v. Poole*, 409 F.3d 48, 67 (2d Cir. 2005) ("[A] petitioner whose claim is that he received ineffective assistance of counsel not only must satisfy the *Strickland* standard but also must show that the state court's rejection of his claim either was contrary to *Strickland* or was an unreasonable application of *Strickland*[.]") (citations omitted).

## CONCLUSION

The application under 28 U.S.C. § 2254 is denied.  The Clerk of the Court is directed to close this case.  Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right.  The Court hereby certifies, pursuant to 28 U.S.C. §

1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated: Rochester, New York
December 30, 2020

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge